David **BERGER** and Gerry Tsupros, on behalf of themselves and others similarly situated, Plaintiffs,

v.

Patricia M. **NAZAMETZ** and Xerox Corporation Retirement Income Guarantee Plan, Defendants.

No. 00–CV–0584–DRH.

United States District Court, S.D. Illinois.

July 27, 2001.

Steven A. Katz, Douglas R. Sprong, Carr, Korein, Swansea, IL, William K. Carr, Law Offices of William K. Carr, Denver, CO, for Plaintiffs.

Richard J. Pautler, Lewis R. Mills, Thompson & Coburn, St. Louis, MO, for Defendants.

## MEMORANDUM AND ORDER

HERNDON, District Judge.

### I. *Introduction*

David Berger filed suit in this Court against the Xerox Corporation Retirement Income Guarantee Plan ("RIGP") and Patricia Nazametz, as the administrators of an employee benefit plan under ERISA. Berger seeks equitable relief, including restitution, for the Plan's alleged violation of ERISA and the Internal Revenue Code and for the alleged implementation of treasury regulations. Berger terminated his employment before a normal retirement age pursuant to a Voluntary Reduction in Force program. Berger alleges that the lump sum distribution of pension benefits that he received when he retired early was less than the present value of his minimum benefits at normal retirement age. On February 7, 2001, the Court certified a class consisting of all RIGP participants who received a lump sum distribution after January 1, 1990 (Doc. 88). On January 10, 2001, Magistrate Judge Gerald B. Cohn entered an Order granting Plaintiffs' motion to add an additional named plaintiff, Gerry Tsupros, finding that Tsupros is similarly situated to Berger.

The parties have filed cross motions for summary judgment as to Counts I, II and III of Plaintiffs' First Amended Complaint (Docs. 56 and 78). On January 4, 2001 and July 3, 2001, the Court heard oral argument on the motions. In addition, the parties have submitted voluminous briefs and exhibits for the Court's consideration. For the following reasons, the Court denies Defendants' motion for summary judgment and grants Plaintiffs' motion for summary judgment as to liability on Counts I and II. The Court grants Defendants' motion for summary judgment as to Count III with Plaintiffs being given leave to amend.

### II. *Summary Judgment Standard*

Summary judgment is proper where the pleadings and affidavits, if any, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.

R. Civ. P. 56(c); *Oates v. Discovery Zone*, 116 F.3d 1161, 1165 (7th Cir.1997)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The movant bears the burden of establishing the absence of fact issues and entitlement to judgment as a matter of law. *Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir.1997)(citing *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548). The Court must consider the entire record, drawing reasonable inferences and resolving factual disputes in favor of the non-movant. *Regensburger v. China Adoption Consultants, Ltd.*, 138 F.3d 1201, 1205 (7th Cir.1998)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

In response to a motion for summary judgment, the non-movant may not simply rest upon the allegations in his pleadings. Rather, the non-moving party must show through specific evidence that an issue of fact remains on matters for which he bears the burden of proof at trial. *Walker v. Shansky*, 28 F.3d 666, 670–71 (7th Cir. 1994), *aff'd*, 51 F.3d 276 (citing *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548). In reviewing a summary judgment motion, the Court does not determine the truth of asserted matters, but rather decides whether there is a genuine factual issue for trial. *Celex Group, Inc. v. Executive Gallery, Inc.*, 877 F.Supp. 1114, 1124 (N.D.Ill.1995). The "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to show a genuine issue of material fact." *Weeks v. Samsung Heavy Industries Co., Ltd.*, 126 F.3d 926, 933 (7th Cir.1997)(citing *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505). No issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

Accord *Starzenski v. City of Elkhart*, 87 F.3d 872, 880 (7th Cir.1996), cert. denied, 519 U.S. 1055, 117 S.Ct. 683, 136 L.Ed.2d 608 (1997); *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 178 (7th Cir.1994).

■■■ Because this case is brought under ERISA, federal common law principles govern. *GCIU Employer Retirement Fund v. Chicago Tribune Co.*, 66 F.3d 862, 864–65 (7th Cir.1995)(citing *Phillips v. Lincoln Nat. Life Ins. Co.*, 978 F.2d 302, 307 (7th Cir.1992)). These principles direct a court to construe terms of ERISA plans "in an ordinary and popular sense as would a person of average intelligence and experience." *Swaback v. American Information Techs.*, 103 F.3d 535, 540–41 (7th Cir.1996). In addition, a court reviews questions of law *de novo*, regardless of whether the plan vests the plan administrator with discretion. *E.g., Williams v. Midwest Operating Eng'rs Welfare Fund*, 125 F.3d 1138, 1140 (7th Cir.1997), *overruled on other grounds, Mers v. Marriott Int'l Group Accidental Death and Dismemberment Plan*, 144 F.3d 1014 (7th Cir. 1998). The issues presented in this case involve questions of law and not plan interpretation. This Court's review of those issues is *de novo* and not under an arbitrary and capricious standard.

### III. *Factual Background*

The underlying material facts relevant to Plaintiffs' and Defendants' motions are not in dispute. Prior to 1990, Xerox maintained a defined contribution plan known as the Xerox Corporation Profit Sharing Plan (the "PSP") and a separate defined benefit plan known as the Xerox Corporation Retirement Income Guarantee Plan (the "RIGP"). These plans represented the two prongs of a so-called "floor offset" arrangement. Under this arrangement, the defined contribution benefit provided by the PSP was applied to offset and

reduce the amount of the defined benefit provided by the RIGP. A participant would always receive a benefit at least equal to the that provided by the RIGP (i.e., the "floor plan"), but might receive a higher benefit if the contributions and earnings attributable to her account in the PSP provided a larger benefit. At all relevant times, the RIGP has provided for a normal retirement age of age 65. RIGP § 1.24. For years prior to 2000, the RIGP has applied the PBGC rates as in effect on the first day of the year in which the distribution is made for purposes of determining the amount of lump sum payments. RIGP § 8.2(a)(v).

As an example of a typical floor-offset arrangement, if the RIGP provided a participant with an age 65 monthly annuity of $1,500, and the participant's account in the PSP would provide a $1,000 monthly annuity also commencing at age 65, the participant would receive a total benefit of $1,500, with $500 payable from the RIGP and the remaining $1,000 payable from the PSP. Changing the example slightly, assume the PSP would provide a $1,500 annuity, while the RIGP would provide only a $1,000 annuity. In this situation, the participant would receive the same $1,500 monthly annuity benefit, but the source of the benefit changes: the PSP pays the entire $1,500 annuity, while the RIGP would pay no portion of the benefit. *E.g., White v. Sundstrand Corporation*, 256 F.3d 580, 2001 WL 748046 (7th Cir. July 3, 2001).

Effective January 1, 1990, Xerox amended the RIGP in two respects relevant to this lawsuit. First, Xerox transferred the defined contribution benefit of each PSP participant, including the named Plaintiffs, to the RIGP (the "1990 transfer"). The participants' PSP benefits were placed in an "account" in the RIGP called a Transitional Retirement Account ("TRA"). Following the 1990 transfer, these TRAs retained their character as defined contribution plan benefits. In the years following the transfer, while the TRAs increased and decreased for investment earnings and losses, Xerox did not make any further contributions to these accounts.

The second relevant amendment added a new defined benefit accrual formula to the RIGP. This formula is commonly referred to as a cash balance plan. Under the formula, balances are determined based on "hypothetical" allocations made to a Cash Balance Retirement Account ("CBRA"). For participants like the named Plaintiffs, who were employed by Xerox prior to 1990, and for whom Xerox transferred their PSP benefits to the RIGP, the RIGP set the opening balance of their CBRAs at the same amount as the amount of their transferred PSP benefit (also the same amount as the beginning balance of each participant's new TRA). For participants who did not have a PSP benefit, the CBRA opening balance was zero, and there was no TRA.

For periods after January 1, 1990, the terms of the RIGP made "hypothetical" allocations to every participant's CBRA. The hypothetical allocations took two forms. First, the RIGP allocated a "compensation credit" equal to 5% of the participant's annual compensation.[1] The second type of credit allocated to the CBRAs is an "interest credit." The RIGP provides for the allocation of interest credits at the "interest crediting rate" defined by the RIGP as the effective average yield for one-year Treasury bills measured as of the first business day of each month of the prior year, plus one percent (the "Interest Crediting Rate").

---

1. The parties have referred to these credits variously as "pay credits" and "employment credits." The Court will refer to them as "compensation credits."

Participants continue to receive compensation credits at a rate of 5% times all compensation earned during their employment with Xerox and while they remain a participant in the RIGP. Unlike compensation credits, the RIGP continues to provide allocations of interest credits at the Interest Crediting Rate to a participant's CBRA until the participant's entire benefit attributable to his or her CBRA has been distributed. Stated differently, the RIGP makes the right to receive interest credits at the Interest Crediting Rate a part of the benefit promised under the CBRA formula. *See, e.g., Esden v. Bank of Boston,* 229 F.3d 154 (2nd Cir.2000). A summary plan description ("SPD") describes this phenomenon. The SPD states that "[i]f you defer payment, the Cash Balance Retirement Account receives interest credit and the Transitional Retirement Account will continue to share in investment results, but no additional Xerox contributions will be made to either account."

The RIGP as amended maintains the floor-offset arrangement. Following the 1990 transfer, the RIGP contained both a defined benefit component and a defined contribution plan component within a single plan.[2] The parties agree that the RIGP, as a Section 414(k) plan, operates as a single plan (albeit with separate defined benefit and defined contribution plan components) in essentially the same way as the pre–1990 floor-offset arrangement where the pre–1990 RIGP operated as a separate defined benefit plan and the PSP operated as a separate defined contribution plan.

The post–1989 RIGP effectuates the floor-offset arrangement by defining the normal retirement benefit provided by the RIGP as the "monthly normal retirement benefit of the largest of a or b or c or e or f below." RIGP § 4.2. Through the mechanism determining the benefit provided by the RIGP as the greater of the TRA benefit or the CBRA formula benefit, the example of the method of calculating benefits under the floor-offset arrangements remains essentially unchanged following the restatement of the RIGP effective January 1, 1990.

Restating the example as applicable to the post 1989–RIGP and the benefits accruing under the TRAs and the CBRA formula: if the CBRA formula provides a participant with an age 65 monthly annuity of $1,500, and the participant's TRA would provide a $1,000 monthly annuity also commencing at age 65. Under the post 1989–RIGP, the participant would still receive a total benefit of $1,500, with $500 payable under the CBRA formula and the remaining $1,000 payable under the TRA. Again, changing the example slightly, assume the TRA would provide a $1,500 annuity, while the CBRA formula would proved only a $1,000 annuity. In this situation, the participant would still receive the same $1,500 monthly annuity benefit, but the source of the benefit changes: the TRA provides the entire $1,500 annuity, while the CBRA formula would provide no portion of the benefit.

Class members, including the named Plaintiffs, are former employees of Xerox and continue as participants in the RIGP. Berger received a lump sum distribution from the Plan in November 1995. Tsupros received a lump sum distribution in approximately August 1998. Because the amount in their TRA exceeded the hypothetical balance of their CBRA at the date of distribution, the Plan distributed the

---

**2.** This "two-plans-in-one" arrangement is authorized by ERISA § 3(35), 29 U.S.C. § 1002(35), and is often referred to as a Section 414(k) plan, in reference to the corresponding section of the Internal Revenue Code of 1986, as amended, 26 U.S.C. § 414(k).

amounts in their TRAs. It is undisputed that in determining the amount of their lump sum distributions, the RIGP did not project any Class member's CBRA to age 65 at the Interest Crediting Rate, or any other rate intended to state the value of the future interest credits the CBRA would have received had it remained in the RIGP.

Tsupros also received a lump sum distribution of an additional defined benefit he accrued known as a "RIGP Plus" benefit.[3] Xerox amended the RIGP in April 1998 to add the RIGP Plus Benefit as an additional defined benefit formula to the RIGP. The RIGP Plus Benefit was made available only to certain "Eligible Members" (i.e., participants) of the RIGP, defined by RIGP § 17.2 as those participants who would have reached age 45, and would have combined age and years of service equal to or greater than 70, as of May 31, 1998. Eligible Members qualified for the additional defined benefit accrual provided by the RIGP Plus Benefit formula if they terminated employment on or after February 1, 1998 and before February 1, 1999.

The RIGP Plus Benefit formula was added to the RIGP document as a new Article 17. RIGP § 17.1 of the 1999 RIGP Restatement provides that Eligible Members who terminate employment during the applicable window period "shall be eligible to receive the 'RIGP Plus Benefit' as defined herein in addition to any benefit otherwise payable under Section 4.2." The 1999 RIGP Restatement defines the RIGP Plus Benefit as a benefit equal in amount to the Eligible Member's "Annual Pay" (as defined in RIGP § 17.4), multiplied by 5%, with the product further multiplied by the

Eligible Member's "Years of Service" completed as of May 31, 1998 (up to a maximum of 20 Years of Service).

The RIGP Plus Benefit is essentially an additional cash balance plan formula benefit accrual, provided to a limited group of participants for a limited period of time. Section 17.5 of the RIGP provides that "the RIGP Plus Benefit shall be paid at the same time and in the same form as the benefit calculated pursuant to Section 4 .2 as elected by the Eligible Member." As with benefits provided under Section 4.2 of the RIGP, the Eligible Member could defer the payment of his RIGP Plus Benefit until he or she reached the normal retirement age of 65. RIGP § 8.9. In addition, unless the participant consented to an immediate distribution, the RIGP could not distribute a participant's accrued benefit from the RIGP unless the "actuarial equivalent of the Member's vested benefit" was less than $5,000.

If a participant's RIGP Plus Benefit was not distributed immediately following the date the participant terminated employment with Xerox, Section 17.5 provides that the amount of the RIGP Plus Benefit continues to receive interest credits at the Interest Crediting Rate applicable to the CBRAs. Section 17.1 provides that once the participant elects to receive the RIGP Plus Benefit, it is calculated in the same manner as the CBRAs under Plan Section 4.2—i.e., it is not projected to age 65 at the Interest Crediting Rate.

Counts I and II of the First Amended Complaint are directed against the RIGP and challenge the calculation of the lump sums as described above. Count III is

---

**3.** Defendants complain that the RIGP Plus Benefits are not described in the plaintiffs' Complaint and should not be considered in the context of the cross motions. However, Plaintiffs' have consistently referred to the RIGP Plus Benefit in the context of Tsupros and in the cross motion briefing. Defendants do not claim surprise or disadvantage. The Court believes it would serve no purpose to require plaintiffs to submit additional pleadings with respect to the RIGP Plus Benefits. *See, e.g.,* FED. R. CIV. PRO. 15(b).

directed at the alleged plan administrator, Patricia Nazametz, and seeks an injunction requiring her to calculate past and future benefits in accordance with ERISA. With respect to Nazametz, Defendants have submitted an unopposed affidavit that she was not the plan administrator at the time of the filing of the original Complaint and is not now the plan administrator.

## IV. *Analysis*

Plaintiffs' motion for summary judgment presents two legal issues relating to whether the manner in which the RIGP calculates lump sum distributions complies with the applicable provisions of Title I of ERISA.[4] The first issue is whether the RIGP's failure to project participants' CBRAs (and their RIGP Plus Benefits) to age 65 in determining their normal retirement benefit resulted in a forfeiture of vested benefits in violation of ERISA § 203(a), 29 U.S.C. § 1053(a). The second issue is whether the RIGP determined and paid lump sum distributions in amounts less than the present value of a participant's normal retirement benefit, and thereby violated ERISA §§ 203(e) and 205(g)(3), 29 U.S.C. §§ 1053(e) and 1055(g)(3).[5]

Plaintiffs contend that the vesting and accrual rules under Title I of ERISA require the RIGP to calculate and pay lump sums in amounts greater than those actually received by Class members. In support of their motion for partial summary judgment as to liability, Plaintiffs rely on two recent circuit court decisions, *Esden v. Bank of Boston,* 229 F.3d 154 (2nd Cir.

2000), *Lyons v.. Georgia–Pacific Corp.,* 221 F.3d 1235 (11th Cir.2000). Plaintiffs contend that *Esden* and *Lyons* are on point, and that the Court should apply the results reached in those cases to the Xerox RIGP. Plaintiffs also rely on Notice 96–8, 1996–1 C.B. 359–61, which Plaintiffs contend represents the position of the Internal Revenue Service on the issues presented.[6]

Defendants have two principle arguments as to why the Class members are not entitled to additional benefits from the RIGP. First, Defendants contend that all Class members, including the named Plaintiffs, received all of the benefits provided by the terms of the RIGP. In addition, without directly challenging the correctness of the legal conclusions reached by the courts in either *Esden* or *Lyons,* or the position asserted by the IRS in Notice 96–8, Defendants have sought to distinguish those cases and the IRS Notice. Specifically, Defendants contend the foregoing authority has no application to this case because the RIGP is a "Section 414(k) plan," where the defined benefit portion of the RIGP (the portion challenged by Plaintiffs) is part of a floor-offset arrangement.

### A. *The "Normal Retirement Benefit" and "Accrued Benefits"*

Application of ERISA's vesting rules turn on two statutorily defined terms of art: the "normal retirement benefit" and "accrued benefits." Specifically, the primary vesting rule mandates that "[e]ach

---

4. For ease of reference, the Court will refer to these issues as the "projection issue" and the "discount rate issue."

5. The ERISA single sum payment rules are part of the ERISA vesting rules and are sometimes referred to as the "cash-out" rules. ERISA §§ 203(e) and 205(g)(3), 29 U.S.C. §§ 1053(e) and 1055(g)(3). The same rules are also contained in the Internal Revenue

Code of 1986, as amended, §§ 411(a)(11) and 417(e), 26 U.S.C. §§ 411(a)(11) and 417(e), and implemented by Treasury Regulation § 1.417(e)–1(d), 26 C.F.R. § 1.417(e)–1(d).

6. The Department of the Treasury, and more specifically the Internal Revenue Service, is the administrative agency with regulatory authority over the provisions of Title I of ERISA at issue in this case.

pension plan shall provide that an employee's right to his *normal retirement benefit* is nonforfeitable upon the attainment of normal retirement age ...." ERISA § 203(a), 29 U.S.C. § 1053(a)(emphasis added). Thus, the "normal retirement benefit" is the lynch pin in determining the amount of the benefits protected by the vesting rules.

The statute generally defines the normal retirement benefit as "the greater of the early retirement benefit under the plan, or the benefit under the plan commencing at normal retirement age." ERISA § 3(22), 29 U.S.C. § 1002(22).[7] Defined benefit plans must offer the normal retirement benefit of every participant in the form of a "qualified joint and survivor annuity" (a "QJSA"), unless the participant and, if married, his or her spouse, waive the right to receive payment in the form of a QJSA. ERISA § 205(a)(1), 29 U.S.C. § 1055(a)(1). For a married participant, the QJSA is an annuity payable for the life of the participant, and following the death of the participant, an annuity payable to the surviving spouse. ERISA § 205(d), 29 U.S.C. § 1055(d); Treasury Regulation § 1.401(a)–20, Q & A 8. For an unmarried participant, the QJSA is an annuity payable for the life of the participant. Treasury Regulation § 1.401(a)–20, Q & A 25(a).

■ Under ERISA, the "accrued benefit" is the portion of the normal retirement benefit which the participant has earned at any point while participating in a defined benefit plan. ERISA § 3(35), 29 U.S.C. § 1002(35). Participants must accrue ben-

efits over their entire working career, or some defined shorter period of time, provided that the accrual of benefits are not so "backloaded" as to violate the ERISA accrual rules. *See Esden v. Bank of Boston*, 229 F.3d 154, 167 n. 18 (2nd Cir.2000) (discussing the accrual rules as they apply to a defined benefit plan with a cash balance formula).

ERISA § (3)(23) defines "accrued benefit" as:

The term "accrued benefit" means—

(A) in the case of a defined benefit plan, the individual's accrued benefit determined under the plan and, except as provided in section 29 U.S.C. § 1054(c)(3) [204(c)(3) ] of this title, expressed in the form of an annual benefit commencing at normal retirement age, or

(B) in the case of a plan which is an individual account plan, the balance of the individual's account.

29 U.S.C. § 1002(23)(cross references added).

■ In short, the statute sets up two separate methods for calculating the amount of participants' "accrued benefits," one method applicable to defined benefit plans and a different method applicable to defined contribution plans. The "accrued benefit" under a defined contribution plan is "the balance of the individual's account," which includes contributions made by the employer (if any) and investment earnings.[8] The "accrued benefit" earned by a participant under a defined benefit plan is

---

7. The applicable Treasury Regulation makes clear the normal retirement benefit is measured in terms of a "periodic benefit" commencing at the plan's normal retirement age. Treasury Regulation § 1.411(a)–7(c)(1), 26 C.F.R. § 1.411(a)–7(c)(1). Thus, the benefit payable at normal retirement age will be the normal retirement benefit, unless the plan provides a larger annuity benefit with pay-

ments commencing as of a date before the plan's normal retirement age.

8. Under ERISA, the terms "individual account plan" and "defined contribution plan" have the same meaning and are used interchangeably. ERISA § 3(34), 29 U.S.C. § 1002(34).

"defined" by the terms of the plan, but it must be expressed as an annual benefit commencing at normal retirement age (age 65 in the case of the RIGP). In the context of a cash balance plan, this means that a participant's accrued benefit is not the hypothetical account balance (the CBRA in the case of the RIGP), rather the accrued benefit is that account balance expressed as an annuity with payments commencing at normal retirement age. *Esden,* 229 F.3d at 166–67.

**B. *Floor–Offset Arrangements and Section 414(k) Plans***

■ Floor-offset arrangements are not uncommon.[9] A floor-offset arrangement allows the employer to apply the benefit earned by an employee under a defined contribution plan to reduce and offset the benefit the employee accrued under a defined benefit plan. Judge Easterbrook recently explained the real implications of a pension plan which provides employees with the "greater of" the benefit accruing under two or more formulas, such as a typical floor-offset arrangement or a Section 414(k) like the Xerox RIGP:

> Any pension plan giving retirees the greater of two amounts, as opposed to the sum of these amounts, can be described as confiscating the difference. That's the nature of a floor-offset plan: the retiree always "loses" the defined-contribution balance (principal and interest) up to the floor in the defined-benefit plan. What the employee loses, the plan receives.

*White v. Sundstrand Corp.,* 256 F.3d 580, 2001 WL 748046 (7th Cir. July 3, 2001).

As a § 414(k) plan, the RIGP has both a defined benefit portion and a defined con-

tribution portion. The defined contribution portion of the RIGP is comprised of the benefit provided by the participants' TRAs (if any). As defined by the statute, the accrued benefit attributable to the defined contribution portion of the RIGP is measured as "the balance of the individual's account." The RIGP provides defined benefits under a defined benefit plan design known as a "cash balance plan." As defined by statute, the accrued benefit attributable to this component is not the account balance, rather it is that account balance projected to age 65 and converted to a life annuity. *Esden,* 229 F.3d at 163–64.

■ While cash balance plans have features akin to defined contribution plans, there is no longer any dispute that cash balance plans must comply with the requirements imposed on defined benefit plans. *Esden,* 229 F.3d at 158–59. As stated by the Second Circuit in *Esden:*

> However, notwithstanding that cash balance plans are designed to imitate some features of defined contribution plans, they are nonetheless defined benefit plans under ERISA. The regulatory consequences of this classification are wide-reaching. First, ERISA § 3(23) provides different definitions of "accrued benefit" for defined benefit and defined contribution plans. Only for a defined contribution plan is "accrued benefit" defined as simply "the balance of the individual's account." ERISA § 3(23)(B); I.R.C. § 411(a)(7)(A). Second, defined benefit plans are subject to a series of parallel statutory constraints—under ERISA and I.R.C.-from which defined contribution plans are ex-

---

9. The Seventh Circuit has encountered floor-offset arrangements in several cases in recent years, and on each occasion the Court has taken the opportunity to describe how these arrangements operate. *Lunn v. Montgomery*

*Ward & Co., Inc.,* 166 F.3d 880 (7th Cir.1999); *Brengettsy v. Ltv Steel (Republic) Hourly Pens. Plan,* 241 F.3d 609 (7th Cir.2001); *White v. Sundstrand Corp.,* 256 F.3d 580, 2001 WL 748046 (7th Cir. July 3, 2001).

empted. Those relevant to this case include: limitations on "backloading" of accruals, see ERISA § 204(b)(1); I.R.C. § 411(b)(1); the valuation rules of I.R.C. § 417(e) as made applicable by I.R.C. § 411(a)(11)(B), see also ERISA §§ 203(e), 205(g); and the definitely determinable benefits requirement of I.R.C. § 401(a)(25).

*Id.*

### C. *The Projection Issue*

 The projection issue turns on the following question: when a participant elects a distribution of his benefits prior to age 65, must the RIGP determine the life annuity attributable to the CBRA (and/or the RIGP Plus Benefit) by projecting the account to age 65 at the Interest Crediting Rate it would have received had it remained in the plan? It is undisputed that the RIGP does not project the accounts in such a manner; instead, when a participant elects a lump sum distribution, the terms of the RIGP call for a projection at the (typically lower) PBGC rate(s) plus a mortality factor.[10]

This precise issue was addressed by the Second Circuit in *Esden*. The pension plan in *Esden* provided for annual interest credits to participants' cash balance accounts equal to the rate for three-month Treasury bills in effect on the first day of each month plus 0.5%. 229 F.3d at 160. However, if a participant elected to receive his cash balance benefit in the form of a lump sum payable before age 65, the plan determined the participant's normal retirement benefit by projecting the account to normal retirement age at a lower rate of only 4%. *Id.* at 161. The evidence in *Esden* demonstrated that the 4% rate was picked

because it would always be at or less than the relevant PBGC rate thus insuring that the plan would not be subject to a so-called "whip saw"—i.e., having to pay more than the cash balance account when the interest crediting rate on the projection side of the equation exceeded the PBGC rate on the discount side of the equation. *Id.*

The Second Circuit held that the foregoing practice results in (a) forfeitures in violation of ERISA § 203(a) and IRC § 411(a), and (b) the payment of lump sums in amounts less than the present value of the participants' normal retirement benefits, violating ERISA § 205(g) and IRC § 417(e). *Esden*, 229 F.3d at 168. The *Esden* Court stated:

> by making part of her benefit conditional on the form of payment chosen the Plan made the benefit forfeitable, in violation of ERISA § 203(a); I.R.C. § 411(a)(2) and Treas. Reg. § 1.411(a)–4T.

*Id.*

IRS Notice 96–8 supports Plaintiffs' position as well. With respect to the rate required to project the participant's account balance to normal retirement age, the Notice states:

> in determining the amount of an employee's accrued benefit, a forfeiture, within the meaning of § 1.411(a)–4T, will result if the value of future interest credits is projected using a rate that understates the value of those credits or if the plan by its terms reduces the interest rate or rate of return used for projecting future interest credits.

1996–1 C.B. at 361 (Part III. A); *see also Esden*, 229 F.3d at 167–69.

---

**10.** As noted, if the participant's TRA exceeds his CBRA, the RIGP does not determine the age 65 benefit attributable to the CBRA at all. Evidence submitted by the named Plaintiffs demonstrated that the PBGC rate(s) during the relevant time frame were lower than the corresponding Interest Crediting Rate in at least 8 of the years covered by this action. For example, in 1996 the Interest Crediting Rate was 7.03%, while the January 1, 1996 PBGC rate was only 4%.

The RIGP's provisions are very similar to the plan provisions at issue in *Esden.* The RIGP provides for interest credits to a participant's CBRA and/or RIGP Plus Benefit at a rate equal to the average rate for one-year Treasury bills as of the first business day of each month of the prior year, plus one percent. As a result, at any point in time a participant has an "accrued benefit" attributable to these accounts equal to the then current balance of the account, plus the right to receive additional future interest credits at the interest crediting rate all the way to age 65 that is then converted into an annuity with payments commencing at age 65.[11] However, the RIGP projects the accounts using an interest rate that understates the value of those future credits. Indeed, the RIGP by its terms reduces the interest rate or rate of return used for projecting future interest credits, the same technique used by the plan at issue in *Esden,* and rejected by the Second Circuit. As a result, RIGP participants forfeit accrued benefits in violation of ERISA § 203(a) and receive lump sum payments in amounts less than the present value of their normal retirement benefits in violation of ERISA § 205(g)(3). *See* Treasury Regulation § 1.417(e)–1(d).

■ Defendants' argument that compliance with the provisions of the RIGP relieve it of compliance with the provisions of ERISA is unavailing. In *Hickey v. Chicago Truck Drivers, Helpers and Warehouse Workers' Union,* the Seventh Circuit rejected the notion that provisions of a pension plan trump statutorily defined terms and/or relieve a plan from complying with statutory mandates. 980 F.2d 465 (7th Cir.1992). Addressing the issue of whether a cost-of-living-adjustment was an "accrued benefit," the *Hickey* Court stated:

> The term "accrued benefit" has a statutory meaning, and the parties cannot change that meaning by simply labeling certain benefits as "accrued benefits," and others, such as the COLA, as "supplementary benefits."

980 F.2d at 468; *see also Esden,* 229 F.3d at 172–73; *Dade v. North American Philips Corp.,* 68 F.3d 1558, 1562 (3rd Cir. 1995) (courts are required to enforce the plan "as written unless we can find a provision of ERISA that contains a contrary directive").

■ Defendants also argue that the RIGP's § 414(k) structure allows it to avoid compliance with the ERISA defined benefit plan rules. They essentially argue that the accrued benefit rules only activate at the time of payment, and if the payment provided by the defined contribution component of the RIGP is larger than the payment provided by the defined benefit component, there is no need to consider the rules applicable to defined benefit plans.

Defendants' argument misconstrues the concept of "accrued benefit" in that it presupposes that a participant's accrued benefit can be determined under the terms of his or her plan without reference to whether those terms violate the law. *E.g., Hickey,* 980 F.2d at 468. As explained above, the RIGP's formula for computing the accrued benefit attributable to the defined benefit component of the plan violates ERISA by understating the value of the interest credits and, thus, the participant's true normal retirement benefit. The bene-

---

**11.** A defined benefit plan need not by its terms provide for an "accrued benefit" in the form of an annual benefit commencing at normal retirement age. However, if a plan fails to provide for a benefit in the preceding form, then the "accrued benefit" is an annual benefit commencing at normal retirement age which is the actuarial equivalent of the accrued benefit determined under the terms of the plan. *See* Treas. Reg. § 1.411(a)–7(a)(1), 26 C.F.R. § 1.411(a)–7(a)(1).

fits provided by a § 414(k) plan's defined benefit component must meet the vesting rules applicable to defined benefit plans. Anything less would allow a § 414(k) plan with an illegal defined benefit formula to skirt the defined benefit rules in any instance where the defined contribution benefit exceeded the illegally computed defined benefit portion of the benefit. Such a result would also be inconsistent with both the express language of the statute and the underlying purposes of § 414(k) plans, which require that all employer contributions and earnings be maintained in a separate account and not be considered for purposes of compliance with the defined benefit rules.[12]

Thus, to determine the actual amount of a RIGP participant's accrued benefit requires a dual determination: (1) what is the accrued benefit attributable to the defined contribution portion of the plan—i.e., the balance of the TRA—*and* (2) what is the accrued benefit attributable to the defined benefit portion of the plan—i.e., the age 65 annuity attributable to the CBRA computed in accordance with the law. Under Defendants' erroneous argument, the Court would make the first determination, but not the second, in any instance where, using only the illegal terms of the RIGP, the defined benefit portion does not yield a larger age 65 benefit. What is required is a comparison of the benefits attributable to the defined contribution portion with the benefits attributable to the defined benefit portion determined in accordance with the law. *See* Revenue Ruling 76–259, 1976–2 C.B. 111 (noting that in a floor-

offset arrangement, the "accrued benefit" under the defined benefit plan must be determined without regard to the offset and must satisfy section 411(b)(1) of the Code).

Ironically, if the Court were to adopt Defendants' argument it would only defeat the claims of those Class members whose TRAs were larger than their CBRAs as of the date of distribution. Plaintiffs presented an abundance of evidence that there are thousands of Class members whose CBRAs exceeded their TRAs or who had no TRAs at all.

The Court, therefore, finds that each Class member is entitled to have his or her benefit recalculated by projecting his or her CBRA to normal retirement age at the Interest Crediting Rate in effect as of the date of distribution and then discounted in accordance with Internal Revenue Code § 417(e) discussed below.

### D. *The Discount Rate Issue*

 The discount rate issue turns on whether the RIGP can treat that portion of a participant's benefit derived from his or her TRA as coming from a defined benefit plan. There is no question that if the answer is no, the RIGP could not use 120% of the PBGC rate(s) to calculate the present value of the normal retirement annuities that have a present value of less than $25,000. ERISA §§ 203(e) and 205(g), 29 U.S.C. §§ 1053(e) and 1055(g) (1993), and IRC §§ 411(a)(11) and 417(e), 26 U.S.C. §§ 411(a)(11) and 417(e)(3) (1993).[13] Defined contribution plans are

---

12. The Defendants' argument would also result in the incongruous result that participants with CBRAs greater than their TRAs would be entitled to have their normal retirement benefits computed using the Interest Crediting Rate, but participants with larger TRAs would not.

13. GATT specifies a different maximum rate for calculating lump sum payments: the an-

nual rate of interest on 30–year Treasury securities (the "GATT rate"). Public Law 103–465; 108 Stat. 4809; 29 U.S.C. § 205(g)(3) (1995); 26 U.S.C. § 417(e)(3) (1995). The legislation did not require immediate adoption of the GATT rate. Instead, a plan could continue to use the PBGC rate until 2000. Plans "in effect before the enactment of [GATT]" could delay implementing the new

not subject to the foregoing provisions. Treas. Reg. § 1.417(e)–1(d)(7), 26 C.F.R. § 1.417(e)–1(d)(7). An applicable Treasury Regulation also makes clear that when a § 414(k) plan pays out the benefit attributable to the defined contribution portion of the plan, those payments come from a defined contribution plan:

> In the case of a section 414(k) plan that includes both a defined benefit plan and a separate account, the rules of sections 401(a)(11) and 417 apply separately to the defined benefit portion and the separate account portion of the plan.

Treas. Reg. § 1.401(a)–20, A–15(a), 26 C.F.R. § 1.401(a)–20, A–15(a).

▮▮▮ Thus, while ERISA allows a plan to have both a defined contribution portion and a defined benefit portion, the benefit attributable to each portion must retain its distinct character as arising under either a defined contribution plan or a defined benefit plan. *See, e.g.,* Treas. Reg. § 1.411(d)–4, A–3(a)(2), 26 C.F.R. § 1.411(d)–4, A–3(a)(2)(prohibiting a plan amendment that would eliminate the "separate account feature of an employee's benefit under a defined contribution plan"). The RIGP, however, adds these amounts together in determining the amount of a participant's lump sum. In doing so, the Plan is ignoring ERISA §§ 3(23) and (35), and valuing a defined benefit of less than $25,000 using interest rates greater than 100% of the PBGC rate in violation of ERISA § 205(g) and IRC § 417(e).

The Court finds that ERISA § 3(35) requires the RIGP to treat the portion of a participant's payment attributable to the TRA as separate from the defined benefit portion of the payment. As such, the RIGP could not combine the two portions for purposes of determining whether use of 120% of the PBGC rate was permissible. The statute demonstrates that where a defined benefit plan provides a benefit based partly on the balance of the separate account of a participant, the benefits based upon the separate account must be treated as coming from a defined contribution/individual account plan.

This result is the most consistent with the purpose of both floor-offset arrangements and § 414(k). In the context of a floor-offset arrangement, it could not be argued that a participant receiving $40,000 from the defined contribution plan and $10,000 from the defined benefit plan could have his $10,000 defined benefit reduced by use of the 120% PBGC rate. There is no suggestion in the text of § 414(k) that the section was designed to create such a loophole simply because two plans within a traditional floor-offset arrangement are combined into one plan.

Thus, the RIGP's use of 120% of the PBGC rate(s) even where a participant's CBRA (or any other defined benefit) has a present value of less than $25,000 violates ERISA and the Internal Revenue Code. The Court **ORDERS** that in recalculating the Class members' benefits in accordance with the Court's finding with regard to the projection issue, a discount rate of 100% of the applicable PBGC rate(s) is to be used where the benefit attributable to the CBRA has a present value of less than $25,000.

---

law until "the first day of the first plan year beginning after December 31, 1999." Thus, prior to the year 2000, plans could continue "using the interest rate determined under the regulations of the Pension Benefit Guaranty Corporation for determining the present value of a lump sum distribution on plan termi-

nation that were in effect on September 1, 1993." 29 U.S.C. § 205(g)(3)(B); 26 U.S.C. § 417(e)(3)(B) (1995).

The RIGP adopted the GATT rate in December 1999, effective only for distributions made after December 31, 1999.

### E. *Summary Judgment as to Defendant Nazametz*

At oral argument, Plaintiffs conceded that Patricia Nazametz is not a proper party. Nazametz is identified on a number of I.R.S. Form 5500s as the RIGP plan administrator, but apparently has not held that position at any time relevant to this action. Thus, the Court GRANTS Nazametz's motion for summary judgment as to Count III. Plaintiffs are given leave to amend Count III naming the appropriate plan administrator on or before August 27, 2001.

### V. *Conclusion*

Accordingly, the Court **DENIES in part** and **GRANTS in part** Defendants' motion for summary judgment (Doc. 78). The Court **DENIES** Defendants' motion for summary judgment as to Counts I and II and **GRANTS** Defendants' motion as to Count III. Further, the Court **GRANTS in part** and **DENIES in part** Plaintiffs' motion for summary judgment on the issue of liability (Doc. 56). The Court **GRANTS** Plaintiffs' motion for summary judgment as to Counts I and II and **DENIES** Plaintiffs' motion as to Count III. The Court **DIRECTS** the Clerk fo the Court to enter judgment in favor of Plaintiffs and against Defendants on the issue of liability as to Counts I and II. The Court **GRANTS** Plaintiffs up to and including August 27, 2001 in which to amend Count III to name the proper party. The Court will set a hearing on damages, prejudgment interest, and all other issues precedent to entry of a final order in this matter by separate order at a later date.

**IT IS SO ORDERED.**