Garland A. **HOLBROOK** and Truck Acceptance Corporation, Plaintiffs-Appellees,

v.

**INSTITUTIONAL INSURANCE COMPANY OF AMERICA,** Defendant-Appellant.

No. 15237.

United States Court of Appeals
Seventh Circuit.

Nov. 15, 1966.

Rehearing Denied Jan. 5, 1967.

Norman J. Barry, Norris J. Bishton, Jr., Chicago, Ill., Rothschild, Hart, Stevens & Barry, Chicago, Ill., of counsel, for appellant.

Edward V. Scoby, Ward P. Fisher, Kralovec, Sweeney, Marquard & Scoby, Chicago, Ill., for appellees.

Before SCHNACKENBERG, SWYGERT, and CUMMINGS, Circuit Judges.

SWYGERT, Circuit Judge.

This diversity action was brought by Garland A. Holbrook, a citizen of New Mexico, and the Truck Acceptance Corporation, a Washington corporation, against the Institutional Insurance Company of America, an Illinois corporation, to recover under the terms of a policy of insurance issued by Institutional. Holbrook, the insured, and Truck Acceptance, a loss payee on the policy, sought to recover for the destruction of a diesel tractor and trailer resulting from a collision on the Indiana Toll Road near Hammond, Indiana on March 4, 1961. Institutional appeals from a judgment of $22,150 in favor of Holbrook and Truck Acceptance entered upon a verdict by the district court sitting without a jury. The principal question is whether insurance coverage on the tractor and trailer was in existence when the loss occurred.

On December 27, 1960, Holbrook, an independent long-haul trucker, visited the office of the White Insurance Agency in Hammond, Indiana and spoke to Wilbur White about obtaining insurance on a 1959 Kenworth diesel tractor owned by Holbrook and financed by Truck Acceptance. White had placed similar insurance on Holbrook's equipment with other

insurance companies on two or three occasions through Philip Caplis of Caplis, Inc. in Chicago, a specialist in long-haul insurance. White phoned Caplis' office and talked to James McGrath, who stated that coverage would be placed with Institutional. Holbrook arranged with White to pay the insurance premiums in monthly installments. White estimated the total yearly premium at $800 and the monthly installments at $100. Holbrook paid White the first month's installment at that time.

Institutional thereafter issued its policy of collision insurance on the tractor at the request of Caplis, Inc. The policy was stated to be effective for the period of one year beginning December 27, 1960, at a premium charge of $800.50 to Holbrook. Institutional delivered the policy to Caplis, Inc. which in turn forwarded it to White; the latter did not deliver the policy to Holbrook, but instead retained it in his possession.

As between Institutional and Caplis, Inc., premiums on policies obtained by Caplis, Inc. were charged on an "account current" basis, a system of debits and credits reflecting all policy transactions during each month and settled by payment at periodic intervals. A similar system was employed between Caplis, Inc. and White.

Holbrook's second installment on the premium was due January 27, 1961, but he paid only half of it to White on that date. On February 7, 1961, White called Caplis, Inc. and requested that the policy be cancelled for nonpayment of premiums. The office girl who accepted the call took the following message:

Policy Canc. for non-pay. Garland Holbrook Inst. Co. * * * Mr. White has Policy.

Caplis sent a note to Institutional on the following day, attaching the telephone message and instructing Institutional to cancel the policy pro rata as of February 7 for "nonpay." On February 16 Institutional mailed a notice of cancellation, effective February 17, to Holbrook. The notice was returned, marked "unclaimed." [1]

Holbrook, who knew nothing about the cancellation by Institutional but had been threatened with cancellation by White, paid the remainder of the January 27 premium installment on February 20. White thereupon called Caplis' office and spoke to Anna Pace, an employee of a firm which shared office space with Caplis and who also frequently rendered services for Caplis. White requested that Holbrook's policy be reinstated. Whether the evidence was sufficient to show that Pace relayed this request to Institutional and received positive assurance is in dispute.

A few days later, on February 24, Holbrook phoned White and requested him to obtain additional collision coverage for a 1955 Brown trailer. White assured him that he would attempt to place the trailer coverage with Institutional and estimated the monthly premium on the trailer at $61. On the same day Holbrook forwarded this amount plus his February 27 installment on the premium for the tractor coverage to White. White again talked to Pace in Caplis' office and requested that the trailer coverage be added to Holbrook's policy with Institutional. Whether Pace, relayed this request to Institutional is again in dispute.

The tractor and trailer were damaged beyond repair in a collision on March 4.

On March 10 Institutional prepared two endorsements on the Holbrook policy, one purporting to reinstate the tractor coverage "effective * * * March 10" at a premium charge of $686.83, the other adding the trailer coverage "effective * * * March 10" at a premium charge of $414.80. In addition, Institutional mailed a letter to Holbrook which stated, "This is to notify you that your automobile physical damage policy * * *

[1]. Subsequently, Institutional credited $686.-83 to Caplis' account, an amount representing Holbrook's total premium less earned premium pro rata between December 27, 1960 and February 17, 1961.

has been reinstated as of this date with no lapse in coverage."

Institutional was notified of the loss on the tractor and trailer a few days later. After conducting an investigation, Institutional cancelled the policy a second time by sending Holbrook ten days' notice of cancellation on April 14.[2] The trailer coverage was cancelled on April 12 by means of an endorsement similar to those prepared on March 10.

### The tractor coverage

The district court concluded that the tractor coverage on Holbrook's policy was in effect at the time of the loss for several reasons. The court held that Institutional failed to prove an effective cancellation on February 17, 1961 because White had no authority to request cancellation on Holbrook's behalf. It also held that Institutional agreed to reinstate the tractor coverage prior to the loss, that Caplis, Inc. had apparent authority to bind Institutional to a reinstatement, that the policy was reinstated without any lapse in coverage by the letter of March 10, and that Institutional waived its right to deny coverage by acceptance of premiums between December 27, 1960 and April 24, 1961 through its accounting arrangement with Caplis, Inc. We think that recovery by Holbrook and Truck Acceptance for the loss of the tractor should be affirmed because of Institutional's knowledge that White was not acting as Holbrook's agent in requesting cancellation of the policy and will confine our discussion to that point.

 Whether an insured may be bound by the acts of a broker engaged to procure insurance for him depends upon the application of general principles of the law of agency to the facts in each

case. The broker's authority stems principally from the agreement entered with the insured and what is to be implied from it. Thus it is generally said that when a broker is engaged to obtain insurance for another, even though he might be given discretion to select the company with whom insurance is to be placed, he exhausts his authority once the insurance is obtained. Smith v. Firemen's Ins. Co., 104 F.2d 546 (7th Cir. 1939). Stated differently, the mere employment of an agent to secure insurance gives the agent neither actual nor apparent authority to cancel it. On the other hand, where there is a general entrusting of insurance affairs by a person to a broker, as for example where a broker is employed to keep property insured for his client, the broker's authority, by agreement or implication, may well extend to the modification or cancellation of policies. 16 Appleman, Insurance Law and Practice, § 8724 (1944). But in order to bind the insured, not only must the broker's authority be established, but it must also be shown that the broker is purporting to exercise it, that is, that he is acting as the agent of the insured.

 Institutional relies solely upon a cancellation of the policy by, or on behalf of, Holbrook.[3] It contends that White, as Holbrook's agent in procuring the policy, had implied authority to cancel it on Holbrook's behalf by virtue of the fact that White was permitted to retain the policy in his possession. In support of its position Institutional refers to a statement in Fowler Cycle Works v. Western Ins. Co., 111 Ill.App. 631, 634 (1904), that "generally speaking, possession of a policy by an insurance broker confers upon him implied authority to procure its cancellation."[4]

2. Caplis' account was credited in the amount of $541.94, a sum representing Holbrook's total premium for tractor coverage less earned premium pro rata between December 27, 1960 and April 24, 1961.

3. Institutional apparently concedes that its notice of cancellation dated February

16, effective February 17, 1961, could not serve as a cancellation by the insurer in accordance with the terms of the contract of insurance, which required ten days' notice of such action.

4. For the contrary view, see Spann v. Commercial Standard Ins. Co., 82 F.2d 593 (8th Cir. 1936).

But even if we assume that White's possession of the policy gave him implied authority to procure its cancellation, it is of no avail to Institutional if Institutional either had knowledge that White had no such actual authority [5] or knew that he was not acting as Holbrook's agent in attempting to cancel it. It is evident from the facts that Institutional may not rely upon White's request as a cancellation by Holbrook for the latter reason. The request itself, as transmitted to Institutional by Caplis, Inc. was a request for cancellation by reason of Holbrook's nonpayment of premiums. As such, the request informed Institutional that it was not being made by a broker as an agent in the service of his principal, but rather was being made independently by a broker serving his own interest. In Central Nat'l Bank v. Jamerson, 50 Ill.App.2d 233, 200 N.E.2d 397, 399 (1964), the court noted that "the broker's direction to [the insurer] to cancel the policy for nonpayment * * * surely is not the work of an agent acting on behalf of [the insured]."

The record in this case shows that Institutional often functioned as a collection agency by sending cancellation notices to policyholders at the request of, and as an accommodation to, brokers to assist them in the collection of premiums.[6] In doing so here, it may not rely upon the implied authority of a broker in possession of the policy to cancel as the "agent" of the insured; therefore, Institutional failed to prove an effective cancellation prior to the loss of the tractor.

*The trailer coverage*

■ The district court made two conclusions of law to support its determination that the trailer coverage on Holbrook's policy was in effect at the time of the loss. It stated that "Caplis' office" had "apparent authority" to bind Institutional to the addition of the trailer, and that Institutional agreed to add the trailer coverage in telephone conversations with Anna Pace prior to the loss on March 4, 1961. No findings of fact relating to the authority of "Caplis' office" were made and the record does not contain sufficient evidence to support this conclusion. As to the second conclusion, the court found, based upon the testimony of Anna Pace, that prior to the loss Pace "made several telephone calls to the office of Institutional concerning the request for reinstatement of the tractor coverage and addition of the trailer coverage and was told that formal confirmation of both would be forthcoming." The court also found that "the first of such calls pertaining to addition of the trailer was made about one week after the date of the cancellation notice." A thorough study of the record compels us to conclude that these critical findings are clearly erroneous. Therefore, recovery against Institutional for the loss of the trailer cannot be sustained.

■ The evidence in the record concerning Caplis' authority to bind Institutional is clear on only one point—that if Caplis had such authority, actual or apparent, he did not exercise it with regard to coverage of the trailer on Holbrook's policy. Caplis testified that he

---

5. In Fowler Cycle Works v. Western Ins. Co., 111 Ill.App. 634 (1904), the insurance company was not permitted to rely upon the implied authority of a broker in possession to cancel a policy because the insurer knew that the broker had ceased to be the agent of the insured prior to his attempt to secure the cancellation.

6. Raymond Embrey, the authorized representative of Institutional in charge of the automobile department, testified as follows:

Many brokers used us as a collection agency. When a policy is unpaid the broker would request us to send a direct notice of cancellation, which is a ten-day notice, that informs an indiviual that—by certified mail—that as of the effective—a certain date—the policy is going to be cancelled. In many cases they immediately rush into the broker and pay the premium, and the broker then calls us and says, "Oops, they came in and paid the premium. Now reinstate the policy."

was appointed as an agent of Institutional by Raymond Embrey, Institutional's authorized representative, and that he received "binding authority." He also testified, however, that his other insurance work required such frequent absences from his office that he instructed the personnel working there to clear all requests concerning Institutional through that company.[7] Further, Caplis testified that he did nothing personally concerning the trailer coverage until he made a call to Embrey on March 10, six days after the loss. Nor did Anna Pace purport to exercise any authority to bind Institutional on the trailer. Pace was not an employee of Caplis. Whatever she did for him in connection with Holbrook's policy was done solely as an accommodation. She testified that she invariably checked with Caplis for instructions concerning Institutional. She also stated that on the occasion in question she called Institutional to request coverage of the trailer and informed White of this fact. Thus if "Caplis' office" had authority to bind Institutional prior to the company's formal commitment, the authority was not exercised and no reliance can be placed upon it.

The question remains whether Anna Pace's testimony that she made several telephone calls to Institutional concerning the trailer coverage may be credited to show that Institutional agreed to include such coverage in the policy prior to the loss. The events about which Pace testified occurred three years prior to the trial. She had no record or memoranda by which she could refresh her memory. Her testimony as to the dates on which her alleged telephone conversations took place was extremely uncertain and in several instances contradictory. In a number of other respects her testimony conflicted with undisputed facts. For example, Pace testified that, "We received a letter from Mr. White asking

us to add another trailer." No such letter was produced by the plaintiffs, and White testified that this transaction was completed through a telephone call. Moreover, Pace testified that any telephone conversations she had with Institutional would be "followed up with a memo" to Institutional, and that a copy of the memo would be placed in Caplis' file. Caplis' complete file on Holbrook was admitted into evidence. It contained no notes of any of the numerous calls Pace claimed to have made in regard to both the reinstatement of the policy and the addition of the trailer, nor copies of any memoranda to Institutional. Nor did Institutional's file contain memoranda of such calls or any notes relating to them. The only memoranda bearing Pace's name in either file, a notice of loss and a request for a corrected endorsement on the trailer, were dated weeks after the loss occurred.

It is not without significance that the trial judge at the conclusion of Pace's testimony appraised it in this manner:

> The witness is testifying that she doesn't have any personal memory except that which relates over by way of refreshment by documents which would be in her files or Mr. Caplis' files or documents which you might have which you would remember, and even then she would only suppose that the thing happened around about the date that was found on those records. This is the usual—this happened years ago. She wasn't personally involved in it. She was just working as a secretary there. To try to prove or disprove your case on her testimony I think is a waste of time.

Ordinarily an appellate court is not permitted to set aside a trial court's findings based primarily upon the credibility of witnesses. But the circumstances present in this case have required us to

---

7. Caplis' testimony appears as follows:
 About the reinstatement and about any additions, after I joined the Reib organization I made it a point inasmuch as McGrath, my man, had left and inasmuch as I was out all the time, that at no time was any of this stuff to be bound, but rather, to be taken up directly with the company.

examine the record critically and, based upon that examination, to reach the conclusion initially reached by the trial judge himself regarding Anna Pace's testimony.

■ The findings adopted by the trial court are subject to one further criticism which detracts from the weight they would otherwise merit. At the trial itself the judge stated, in effect, that he could base no findings on Pace's testimony. One year later he ruled generally for the plaintiffs and directed that plaintiffs' counsel prepare proposed findings of fact and conclusions of law. The findings submitted, including those as to Pace's testimony, were adopted as the findings of the court. We do not wish to depart from the views expressed in Taylor Instrument Cos. v. Fee & Stemwedel, Inc., 129 F.2d 156 (7th Cir. 1942), concerning the practice of permitting the parties to submit proposed findings to the trial court prior to its decision and the adoption of all or some of the prevailing party's proposals in the court's decision. But that was not the procedure followed in the instant case. The trial judge announced his decision for the plaintiffs and then directed them to prepare findings which he subsequently adopted without change. The identical practice was recently condemned by the Third Circuit in Roberts v. Ross, 344 F.2d 747, 751–752 (3d Cir. 1965).[8] We are in full accord with the views there expressed.

*Interest and attorneys' fees*

■ Institutional contends that the district court erred in awarding the plaintiffs interest on the amount of the judgment from April 1, 1961 and in allowing them $500 in attorneys' fees pursuant to Ill.Rev.Stat. ch. 73, § 767 (1965). Interest on the amount of the judgment attributable to recovery for loss of the tractor was properly granted. Ill.Rev. Stat. ch. 74, § 2 (1965). The court found that Institutional completed its investigation of the loss on April 1, 1961, at

which time payment on the policy became due. The award of attorneys' fees, however, was an abuse of the trial court's discretion. Attorneys' fees are allowable under the statute only when the refusal of the insurance company to pay a claim is "vexatious and without reasonable cause." The denial of the plaintiffs' claim by Institutional under the facts in this case cannot be deemed vexatious and without reasonable cause.

Finally, Institutional complains that it was deprived of a fair trial because of the excessive questioning of the witnesses by the trial judge. In view of our disposition of the substantive issues, we find it unnecessary to discuss this contention.

The judgment is affirmed insofar as it allows recovery for loss of the tractor and interest thereon; in all other respects the judgment is reversed.

---

8. See also United States v. El Paso Natural Gas Co., 376 U.S. 651, 656–657, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964).