**David BERGER, et al., Plaintiffs,**

v.

**XEROX RETIREMENT INCOME GUARANTY PLAN, et al., Defendants.**

No. 00–00584–DRH.

United States District Court, S.D. Illinois.

Sept. 30, 2002.

Steven A. Katz, Douglas R. Sprong, Carr, Korein, et al., Swansea, IL, William K. Carr, Law Offices of William K. Carr, Denver, CO, for Plaintiffs.

Richard J. Pautler, Lewis R. Mills, Thompson Coburn, St. Louis, MO, for Defendants.

## MEMORANDUM AND ORDER

HERNDON, District Judge.

### I. *Introduction*

On July 27, 2001, the Court entered partial summary judgment against the Xerox Retirement Income Guaranty Plan ("RIGP" or "the Plan"), holding that the RIGP violated ERISA (Doc. 126). *Berger v. Nazametz*, 157 F.Supp.2d 998 (S.D.Ill. 2001), citing *Esden v. Bank of Boston*, 229 F.3d 154 (2d Cir.2000); *Lyons v. Ga.-Pacific Corp.*, 221 F.3d 1235 (11th Cir.2000); I.R.S. Notice 96–8, 1996–1 C.B. 359–61, 1996 WL 17901. The Court directed Plaintiffs to submit to the Court a report indicating the amount of additional benefits owed to the Class members calculated "by projecting his or her CBRA to normal retirement age at the Interest Crediting Rate in effect as of the date of distribution and then discounted in accordance with Internal Revenue Code § 417(e) discussed below." *Berger*, 157 F.Supp.2d at 1010. Additionally, the Court granted Plaintiffs leave to file an amended complaint joining as a party defendant the current administrator of the RIGP (Doc. 126).

This matter is now before the Court on the Class Plaintiffs' Motion for Summary Judgment as to the amount of the additional benefits owed (Doc. 136). Plaintiffs prepared and have submitted to the Court spreadsheets recalculating the benefits for all Class members for whom the RIGP has produced sufficient recalculation information,[1] the affidavit of an enrolled actuary, Douglas D. Ritter, regarding the preparation of the spreadsheets, the affidavit from the data entry coordinator, Sandra Howell, and legal argument as to both the calculation of the additional benefits owed and the appropriate amount of prejudgment

---

1. It appears the Plan has not produced information necessary to recalculate benefits for some Class members.

interest for those Class members entitled to additional benefits.

Plaintiffs request that the Court enter a judgment in this case awarding equitable restitution in the amount of the difference between the lump sum distributions as calculated by the Class Plaintiffs and the lump sum distributions the Plan originally made. These amounts are set forth in the Spreadsheets. Plaintiffs also ask the Court to award prejudgment interest on the principal amount of the under-payments to the Class at the prime rate for the period beginning on the date of the withholding of the Class members' respective benefits to the date of the entry of a final judgment and order. In addition, Defendant Conkright, who Plaintiffs added as the purported Plan administrator, has moved for summary judgment on the ground that she was not the Plan administrator at any time during the pendency of this litigation (Doc. 146).

On September 6, 2002, the Court heard oral argument on Plaintiffs' Motion and Defendant Conkright's Motion. The Court has carefully reviewed and considered the briefs and exhibits submitted by the parties, including the benefit calculations shown on the spreadsheets submitted by Plaintiffs. For the following reasons, the Court grants Plaintiffs' Motion for Summary Judgment (Doc 136). The Court also grants Defendant Conkright's Motion for Summary Judgment in her individual capacity, as the parties do not dispute she has not acted as the Plan's administrator at any point during the pendency of this case (Doc. 146).

## II. *Background*

RIGP is a form of pension plan commonly referred to as a cash balance plan. When it paid lump-sum distributions to Class members, the RIGP failed to project the participants' cash balance accounts [2] to age sixty-five at an interest rate designed to approximate the future value of the interest credits otherwise provided by the Plan. The "projection" of accounts, coupled with the "discounting" applicable to determining the present value of lump-sum payments, is sometimes pejoratively referred to as the "whipsaw" requirement. The "whipsaw" requirement can result in larger benefit payments. *See Esden v. Bank of Boston*, 229 F.3d 154, 159 & n. 7 (2d Cir.2000). This is precisely what the parties are arguing over in this case.

The Plan provides for interest credits equal to the average rate for one-year Treasury bills as of the first business day of each month of the prior year, plus one percent ("Interest Crediting Rate"). Instead of projecting at the Interest Crediting Rate or a rate based on that rate, the RIGP projected the accounts at rates based on the prevailing interest rate used by the Pension Benefit Guaranty Corporation ("PBGC") for the calculation of lump sum payments. These PBGC rates were typically lower than the corresponding Interest Crediting Rates. Because the PBGC rates used for the projection were also the maximum rates allowed by ERISA for "discounting" to determine the amount of a lump sum payment,[3] the "whipsaw" calculation as performed by the RIGP always produced the same number from whence it started, and the Plan simply paid lump sums equal to the cash balance account.[4]

2. Two cash balance accounts are at issue in the RIGP: the Cash Balance Retirement Accounts ("CBRAs") and the RIGP Plus Accounts. Under the Plan, both of these accounts earned the same interest credits, and their lump sum equivalents were calculated in the same way. *See* 1999 Rest. of the Plan § 17 (for the RIGP Plus Accounts) and § 19 **(for the CBRAs).**

3. *See* ERISA § 205(g)(3), 29 U.S.C. § 1053(g)(3); Treasury Regulation § 1.417(e)–1(d).

4. Because it is a so-called "Section 414(k) plan," the RIGP presents additional complexi-

### III. *Analysis*

#### A. *Summary Judgment*

Summary judgment is proper where the pleadings and affidavits, if any, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Oates v. Discovery Zone*, 116 F.3d 1161, 1165 (7th Cir.1997) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The movant bears the burden of establishing the absence of fact issues and entitlement to judgment as a matter of law. *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir.1997)(citing *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548). The Court must consider the entire record, drawing reasonable inferences and resolving factual disputes in favor of the non-movant. *Regensburger v. China Adoption Consultants, Ltd.*, 138 F.3d 1201, 1205 (7th Cir.1998)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

In response to a motion for summary judgment, the non-movant may not simply rest upon the allegations in his pleadings. Rather, the non-moving party must show through specific evidence that an issue of fact remains on matters for which he bears the burden of proof at trial. *Walker v. Shansky*, 28 F.3d 666, 670–71 (7th Cir. 1994), *aff'd*, 51 F.3d 276, 1995 WL 115867 (7th Cir.1995) (citing *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548). In reviewing a summary judgment motion, the Court does not determine the truth of asserted matters, but rather decides whether there is a genuine factual issue for trial. *Celex Group, Inc. v. Executive Gallery, Inc.*, 877 F.Supp. 1114, 1124 (N.D.Ill.1995). The "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to show a genuine issue of material fact." *Weeks v. Samsung Heavy Indus. Co., Ltd.*, 126 F.3d 926, 933 (7th Cir.1997)(citing *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505). No issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted). Accord *Starzenski v. City of Elkhart*, 87 F.3d 872, 880 (7th Cir.1996), cert. denied, 519 U.S. 1055, 117 S.Ct. 683, 136 L.Ed.2d 608 (1997); *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 178 (7th Cir.1994).

 Because this case is brought under ERISA, federal common law principles govern. *GCIU Employer Retirement Fund v. Chicago Tribune Co.*, 66 F.3d 862, 864–65 (7th Cir.1995)(citing *Phillips v. Lincoln Nat. Life Ins. Co.*, 978 F.2d 302, 307 (7th Cir.1992)). These principles direct a court to construe terms of ERISA plans "in an ordinary and popular sense as would a person of average intelligence and experience." *Swaback v. Ameritech*, 103 F.3d 535, 540–41 (7th Cir.1996). In addition, a court reviews questions of law *de novo*, regardless of whether the plan vests the plan administrator with discretion. *E.g.*, *Williams v. Midwest Operating Eng'rs Welfare Fund*, 125 F.3d 1138, 1140 (7th Cir.1997), *overruled on other grounds*, *Mers v. Marriott Int'l Group Accidental Death and Dismemberment Plan*, 144 F.3d 1014 (7th Cir.1998). The issues presented in this case involve questions of law and not plan interpretation. This Court's review of those issues is *de novo* and not under an arbitrary and capricious standard.

ties. See the Court's discussion of this "two-plans-in-one" arrangement in *Berger v. Naza-* *metz*, 157 F.Supp.2d 998 (S.D.Ill.2001).

### B. *Factual Findings with Respect to the Recalculated Benefits.*

Plaintiffs loaded the Class members' benefit information onto an Excel spreadsheet designed by its consulting actuary. The Plan provided all of the information loaded onto the spreadsheet either in the form of hard copies of "Actual RIGP Calculation" worksheets for 1990–1997, or in the form of a data spreadsheet and/or other imaged data files for 1998–1999 (Affidavit of Sandra Howell). In addition, Class counsel obtained from the Plan's trustee, State Street Bank & Trust, via subpoena copies of the Forms 1099 filed for the lump sum payments made during the years 1994–1999, allowing them to cross-check data and to supply payment information where the worksheets were incomplete.

Plaintiffs recalculated the normal retirement benefit derived from the Class members' CBRAs using the Plan's Interest Crediting Rate in effect as of the year that each participant received his or her distribution (Affidavit of Douglas D. Ritter, ¶ 5). The recalculated normal retirement benefit attributable to the CBRA was then offset by the age sixty-five annuity attributable to the participants Transitional Retirement Accounts ("TRAs"),[5] if any, in accordance with the procedures the Plan claims it used during the Class period to determine such annuities (*Id.* at ¶ 6). The present value of the remaining annuity, if any, was then determined using the required actuarial assumptions as of the date of the original lump sum distribution (*Id.*). For some, but not all, Class members, this recalculation resulted in substantial additional benefits. For others, such as Plaintiff David Berger, the recalculations produced no additional benefits because the Class member's projected CBRA did not exceed his projected TRA offset.[6]

With respect to the RIGP Plus Accounts, Plaintiffs recalculated the normal retirement benefit attributable to the accounts again using the Plan's Interest Crediting Rate in effect as of the year that each participant received a distribution of the RIGP Plus benefit (Affidavit of Douglas D. Ritter, ¶ 7). The present value of the recalculated normal retirement benefit attributable to the RIGP Plus was then determined using the required actuarial assumptions as of the date of the original lump sum distribution (*Id.*). Because the RIGP Plus Accounts were not offset by the projected TRAs, this recalculation resulted in additional benefits for all Class members entitled to a RIGP Plus Account benefit.

The RIGP raised a variety of procedural and legal arguments challenging whether the Court can or should enter a final judgment in this action. These are discussed in greater detail below. However, the RIGP has not disputed the mechanics employed by the Class Plaintiffs in gathering the data used for the recalculations, and loading that data into the spreadsheet. This is not to say that the RIGP does not dispute that any additional benefits are due (it does). However, Defendant's disputes concern the actual rates and discounts used in calculating benefits due.

---

5. The TRAs represent the defined contribution portion of the RIGP. See discussion in *Berger,* 157 F.Supp.2d 998 (S.D.Ill.2001).

6. The fact that Mr. Berger is not entitled to an increased benefit does not require dismissal of this action. *See* the Court's Order dated June 26, 2001. In addition, it is undisputed that Mr. Tsupros is entitled to additional benefits when his RIGP Plus account is projected and discounted as required by the Court's prior liability Order.

## C. *RIGP's Procedural Arguments Raised Against Entry of Final Judgment*

The Plan raises what it terms procedural objections to the entry of a final judgment in this matter. It contends that the Court cannot grant the relief sought by the Class Plaintiffs against the RIGP because an order requiring the payment of benefits from a pension plan can only be directed to the plan administrator. The Plan also contends that the Court cannot enter a final judgment in this case because absent class members cannot appeal its entry. Finally, the RIGP renews its argument that the relief sought by the Class members is barred by the holding in *Great–West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002). The Court finds the Plan's procedural objections without merit. No reason exists for this Court to delay entry of a final judgment.

### 1. *Entry of Judgment Against the Plan*

■ The first procedural argument rests on the premise that the Class Plaintiffs are seeking an "injunction" requiring the *Plan* to pay plan benefits. From this premise, the RIGP argues that the Court can only enter such relief against the administrator of the RIGP, and not the Plan itself, citing the decisions in *Hall v. Lhaco, Inc.,* 140 F.3d 1190 (8th Cir.1998), and *Hunt v. Hawthorne Assoc., Inc.,* 119 F.3d 888 (11th Cir.1997). As an initial matter, the Court notes that the Seventh Circuit has held that an ERISA action to recover plan benefits from an employee benefit plan can *only* be brought against the plan. *See Holy Cross Hosp. v. Bankers Life & Cas. Co.,* No. 01C1505, 2002 WL 1822916, *1 (N.D.Ill. Aug.7, 2002); *see also Riordan v. Commonwealth Edison Co.,* 128 F.3d 549, 551 (7th Cir.1997). Thus, the premise underlying the Plan's argument is not the law in this Circuit.

*Hall* is of no help to Defendants in this case. The court in *Hall* concluded that Hall, by seeking prospective injunctive relief, injunctive relief to correct past behavior, and an accounting, sought "an effective injunction, and for that matter an effective accounting," which "could be had only against *the Plan or* the current Plan Administrator." *Hall,* 140 F.3d at 1196 (emphasis added). Thus, even the *Hall* court found that the plan itself was a proper party defendant under § 502(a)(3).

However, *Hunt* explains that, in an action to recover benefits owed under a plan brought pursuant to ERISA § 502(a)(1)(B),[7] the only proper relief is an injunction directed against the plan administrator. *See;* 119 F.3d at 908 & n. 54. Even assuming, *arguendo,* that *Hunt* was the law in this circuit, which it is not, *Hunt*'s holding is irrelevant in this case, because Plaintiffs seek equitable relief from the Plan as expressly authorized by ERISA § 502(a)(3), rather than under ERISA § 502(a)(1)(B). As the Supreme Court has instructed, § 502(a)(3) contains no restrictions on who can be sued. *See Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.,* 530 U.S. 238, 246, 120 S.Ct. 2180, 147 L.Ed.2d 187 (2000) (ERISA § 502(a)(3) "admits of no limit ... on the universe of possible defendants"). *See also Trs. of Cent. State S.E. & S.W. Areas Health & Welfare Fund v. State Farm Mut. Auto. Ins. Co.,* No. 89C0435, 1990 WL 7181, at *2 (N.D.Ill. Jan.17, 1990).

### 2. *Entry of Final Judgment*

■ The RIGP also contends that the Court cannot enter a "final judgment" within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 54 because absent mem-

---

7. 29 U.S.C. § 1132(a)(1)(B).

bers of the Class cannot appeal from a final Order in this case. As a general principle, a judgment in a class action is binding as to absent class members. *See In re VMS Sec. Litig.*, No. 89C9448, 1992 WL 203832, at *3 (N.D.Ill. Aug.13, 1992); *Wagner v. Lehman Bros. Kuhn Loeb Inc.*, 646 F.Supp. 643, 660 (N.D.Ill.1986) (quoting *Hansberry v. Lee*, 311 U.S. 32, 45, 61 S.Ct. 115, 85 L.Ed. 22 (1940)). It is likewise the well-established rule that a decision is final, and thus appealable, when it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945). *See also Soo Line R.R. Co. v. Escanaba & Lake Superior R.R. Co.*, 840 F.2d 546, 550 (7th Cir.1988).

Plaintiffs compiled the relevant benefit information with respect to the Class members in a database and submitted the same to the Court. With the assistance of their consulting actuary, Plaintiffs prepared a benefit computation spreadsheet that, upon entry of the relevant data, yields the amount of the additional benefits due a Class member, if any. Plaintiffs have submitted to the Court the spreadsheets containing the relevant data and benefit computations for all Class members for whom data is currently available. This Court's judgment will be final because "the process of reducing it to a sum certain [is] indeed mechanical." *Herzog Contracting Corp. v. McGowen Corp.*, 976 F.2d 1062, 1064 (7th Cir.1992); *See also Mercer v. Magnant*, 40 F.3d 893, 896 (7th Cir.1994); *Prod. & Maint. Employees' v. Roadmaster Corp.*, 954 F.2d 1397, 1401–02 (7th Cir.1992). In sum, the Court finds no merit in the Plan's contention that a final order cannot be entered in this case.

### 3. Great–West Life & Annuity Ins. Co. v. Knudson

In its briefs, the RIGP renews its argument that this action is barred under the holding of *Great–West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002). Defendant's renewed argument fails to raise any issue not previously considered by this Court prior to entry of its Order rejecting the Plan's original challenge. *See Berger v. Nazametz*, No. 00–CV–0584–DRH, 2002 WL 1774744 (S.D.Ill. July 22, 2002). For the reasons set forth in its Order dated July 22, 2002, the Court again rejects the RIGP's challenge to this action based on the holding in *Great–West Life*. *See also May Dept. Stores Co. v. Fed. Ins. Co.*, 305 F.3d 597, 603 (7th Cir.2002)(rejecting pension plan's argument that ERISA § 502(a)(3) provides no remedy for statutory violations of ERISA, and noting, "[t]hat argument if accepted would create a huge hole in the statute.").

### D. Substantive Arguments Against Granting Summary Judgment

#### 1. RIGP Plus Benefits

■ The Plan once again argues the RIGP Plus benefits are not properly at issue in this case because those benefits are not specifically mentioned in the Amended Complaint. The Court addressed this argument in its July 27, 2001 Order, holding that the pleadings would be deemed amended under FEDERAL RULE OF CIVIL PROCEDURE 15(b) to cure any perceived defect in the pleadings. *See Berger*, 157 F.Supp.2d at 1004 n. 3 (S.D.Ill.2001). This Order is the law of the case. *See Carr v. O'Leary*, 167 F.3d 1124, 1126 (7th Cir.1999).

■ Alternatively, the RIGP suggests, without ever asserting the correctness of the premise, that the RIGP Plus Accounts might be "severance benefits" as opposed to pension benefits. The Court finds this position to be without merit. No dispute exists that the RIGP Plus benefits were paid from the RIGP, a pension plan,

and that pension plans are not permitted to pay severance benefits. *See Bellas v. CBS, Inc.,* 221 F.3d 517 (3d Cir.2000) ("job separation benefits" paid from pension plan must be treated as accrued benefit under the law); Treasury Reg. § 1.401–1(b)(1)(i); I.R.S. Gen. Counsel Memo. 39869, 1992 WL 798073, at *3–*4. The Plan has offered no persuasive legal authority supporting the suggestion that the RIGP Plus accounts could legally constitute severance benefits.

■ To the contrary, abundant evidence exists in the record supporting the conclusion that the RIGP Plus benefits are indeed pension benefits. The RIGP document itself purports to pay the RIGP Plus benefits as pension benefits and not severance benefits. Further, the materials sent to the RIGP Plus recipients, including Class representative Gerry Tsupros, describe the RIGP Plus as pension benefits paid from a pension plan.[8] In view of this evidence, the fact that Plaintiffs' actuary did not have an opinion as to whether the RIGP Plus benefits are pension benefits or severance benefits fails to show the existence of a genuine issue of material fact. "[A] scintilla of evidence in support of the non-movant's position is insufficient to successfully oppose summary judgment." *Weeks v. Samsung Heavy Indus. Co., Ltd.,* 126 F.3d 926, 933 (7th Cir.1997) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

## 2. *Use of Pre–Retirement Mortality to Determine Present Value*

■ The RIGP contends that Plaintiffs' benefit calculations overstate the amounts owed to the Class members because they fail to employ a pre-retirement mortality discount in determining the present value of the Class members' normal retirement benefits payable from the RIGP. The Court finds that a pre-retirement mortality discount is not appropriate under the facts of this case.

As a preliminary matter, the Court reminds the Plan that the Court is considering questions of law, not plan interpretation, and that it does so *de novo.* *See Berger,* 157 F.Supp.2d 998, 1001 (citing *Williams v. Midwest Operating Eng'rs Welfare Fund,* 125 F.3d 1138, 1140 (7th Cir.1997)). Thus, whether the Plan administrator has utilized a pre-retirement mortality discount in the past in other circumstances or believes that use of such a discount would be appropriate is irrelevant to the Court's inquiry. Accordingly, the Court will not refer the issue of pre-retirement mortality discount to the Plan administrator for consideration.

ERISA establishes minimum vesting standards for pension plans. *See* ERISA § 203(a).[9] Once a participant completes the required period of service, five years in the case of the RIGP, the participant becomes fully vested and his or her "accrued benefit," is deemed "nonforfeitable." *See* ERISA § 3(35).[10] Treasury Regulations

---

**8.** See document entitled "RIGP Plus Questions And Answers", attached as Exhibit 2 to Reply in Support of Class Plaintiffs Summary Judgment Motion. (Doc. 62) Q & A 1 differentiates the RIGP Plus benefit from a "VRIF" benefit (voluntary reduction in force salary continuance, i.e., "severance benefits"), noting that the RIGP Plus benefits are paid from the RIGP "which offers favorable tax consequences." Severance benefits are not entitled to "favorable tax consequences," and are treated as ordinary income. Q & A 6 states as follows: "RIGP Plus is offered under the re-

tirement plan, and the RIGP Plus benefit is paid through the plan. The plan does not provide for any type of salary continuance or bridging to retirement." Finally, Q & A 15 advised participants that participants could "rollover" their RIGP Plus benefit-a tax treatment generally available only to benefits paid from an tax qualified retirement plan.

**9.** 29 U.S.C. § 1053(a).

**10.** 29 U.S.C. § 1002(35); 29 U.S.C. § 1053(a); 26 U.S.C. § 411(a).

implement the ERISA vesting requirement. *E.g.* Treasury Regs. § 1.411(a)–4(a) (**"Certain adjustments to plan benefits such as adjustments in excess of reasonable actuarial reductions, can result in rights being forfeitable."**) While certain benefits provided under the RIGP are reduced when a participant dies before reaching retirement age, this is not true of the cash balance accounts. When a participant dies before reaching age sixty-five, the RIGP will pay to her beneficiary the entire amount allocated to her cash balance account(s). Use of a mortality discount for the period before age sixty-five would, accordingly, result in a partial forfeiture of benefits in violation of the ERISA vesting rules (i.e., the anti-forfeiture rules).

In addition, using pre-retirement mortality to determine the present value of a normal retirement annuity that does not decrease if the participant dies prior to age sixty-five results in a lump sum with a value less than the actuarial equivalent of the annuity form of benefit it replaces. Treasury Reg. § 1.417(e)–1(d) prohibits this result. The Regulation provides:

> A defined benefit plan must provide that the present value of any accrued benefit and the amount (subject to sections 411(c)(3) and 415) of any distribution, including a single sum, must not be less than the amount calculated using the applicable interest rate described in paragraph (d)(3) of this section (determined for the month described in paragraph (d)(4) of this section) and the applicable mortality table described in paragraph (d)(2) of this section. *The present value of any optional form of benefit cannot be less than the present value of the normal retirement benefit* determined in accordance with the preceding sentence.

26 C.F.R. § 1.417(e)–1(d)(1) (**emphasis added**). Here, using a pre-retirement mortality discount to determine the present value of a benefit that must be paid in all events and does not decrease if the participant dies prior to reaching age sixty-five, results in a "present value" that is less than the corresponding normal retirement benefit and runs afoul of this Regulation.

Section 204(c)(3) of ERISA [11] and Internal Revenue Code § 411(c)(3) [12] provide that, in the case of a defined benefit plan, where either an employee's accrued benefit *or* his contributions are payable in a form other than an annual benefit commencing at normal retirement age, the optional form "as the case may be, shall be the actuarial equivalent of such benefit or amount determined in accordance with paragraph (1) [which relates to the accrued benefit derived from employer contributions] or (2) [which relates to the accrued benefit derived from employee contributions]." These provisions further reflect the rule that an optional benefit form, such as a lump sum, must be *no less than* the actuarial equivalent of the normal benefit form. *See also* Treasury Reg. § 1.401(a)(4)–12, 26 C.F.R. § 1.401(a)–12.

The Court's application of the statutes and regulations is consistent with the position of the Internal Revenue Service in Notice 96–8. Reiterating that cash balance plans must comply with the present value rules under Code § 417(e)(3) and the anti-forfeiture rules under Code § 411(a), Notice 96–8 outlines the proper methodology for computing a lump sum under a cash balance plan that utilizes a crediting rate that exceeds the applicable discount rate. Recognizing that interest credits to age sixty-five are part of the participant's accrued benefit and cannot be forfeited and

---

**11.** 29 U.S.C. § 1054(c)(3).

**12.** 26 U.S.C. § 411(c)(3).

that the age sixty-five account balance from which the age sixty-five annuity is derived is always payable, Notice 96–8 does not apply a mortality discount for the period *before* age sixty-five. Instead, for the discount period before age sixty-five, Notice 96–8 applies only the maximum interest discount allowed under Code § 417(e) (ERISA § 203(e)(2)) with no added discount for pre-retirement mortality.

In other contexts where there can be no forfeiture of a benefit, ERISA precludes use of a pre-retirement mortality discount. For example, under ERISA § 204(c), the accrued benefit derived from employee contributions is the amount determined by (1) projecting the employee's accumulated contributions to normal retirement age utilizing the interest rate specified in ERISA § 205(g)(3); (2) converting the age sixty-five accumulated amount to an annuity; and (3) then discounting the age sixty-five annuity to present value, again applying only a discount for interest at the rate set forth in ERISA § 205(g)(3).[13] As Plaintiffs point out, this statutory formula for determining the accrued benefit derived from employee contributions does not specify, and therefore does not permit, use of pre-retirement mortality. Benefits derived from employee contributions may never be forfeited. *See* ERISA § 203(a)(1).[14] Use of a discount for the probability of death to reduce the amount of a benefit payable in the future will result in a current benefit amount with a "present value" less than the future benefit, where the future benefit must be paid in all events and where no portion is subject to reduction if the participant dies. Because the RIGP also does not condition receipt of the entire cash balance accounts on living to age sixty-five, this rationale is equally applicable to the computation of lump sum benefits under the Plan.

Plaintiffs also point to a "safe harbor" Treasury regulation, § 1.401(a)(4)–8(c)(3), pertaining exclusively to cash balance plans, as further evidence that cash balance plans may not use a pre-retirement mortality decrement. Under the Regulation, a cash balance plan will be deemed in compliance with Code § 401(a)(4), if the plan contains certain specified design features. One such feature is that the cash balance plan's crediting rate must be either a "standard interest rate" or one of several specified variable rates. Treasury Reg. § 1.401(a)(4)–8(c)(3)(iv)(B)–(C). The "standard interest rate" is any single rate between 7.5% and 8.5%. *Id.* There are nine permissible variable rates, eight of which are based upon a specified Treasury obligation. *Id.*

The only variable rate not based upon any Treasury obligation is the single rate derived from a projection-forward and discount-back methodology utilizing (1) the Code § 417(e) interest rates for computing lump sum distributions in excess of $25,000, and (2) a standard mortality table, "but assuming no mortality before normal retirement age":

(ix) The single interest rate such that, as of a single age specified in the plan, the actuarial present value of a deferred straight life annuity *of an amount commencing at the normal retirement age* under the plan, calculated using that interest rate and a standard mortality table *but assuming no mortality before normal retirement age,* is equal to the actuarial present value, as of the single age specified in the plan, of the same annuity calculated using the section 417(e) rates applicable to distributions in excess of $25,000 (determined under § 1.417(e)–1(d)), and the same mortality assumptions.

---

**13.** *See* 29 U.S.C. § 1054(c)(2)(B)-(C).

**14.** 29 U.S.C. § 1053(a)(1).

Treasury Reg. § 1.401(a)(4)–8(c)(3)(iv)(C)(ix). Thus, the single safe-harbor rate that is derived from a projection-forward/discount-back methodology expressly provides that mortality may not be assumed before normal retirement age. Application of pre-retirement mortality to the pre-retirement projection-forward/discount-back period (i.e., the period *before* normal retirement age) would effectively cause a forfeiture of a portion of the participant's interest credits and, thereby, violate the anti-forfeiture rules under ERISA § 203(a) [15] and Code § 411(a).[16]

Finally, Plaintiffs point out the manner in which the IRS prohibits the use of pre-retirement mortality in the context of deferred compensation plans. *See generally* Treasury Reg. § 31.3121(v)(2)–1(c)(2)(ii). The Treasury Regulation provides

"(ii) Present value defined. For purposes of this section, present value means the value as of a specified date of an amount or series of amounts due thereafter, where each amount is multiplied by the probability that the condition or conditions on which payment of the amount is contingent will be satisfied, and is discounted according to an assumed rate of interest to reflect the time value of money .... For this purpose, a discount for the probability that an employee will die before commencement of benefit payments is permitted, but only to the extent that benefits will be forfeited upon death."

While Plaintiffs concede the Regulation is not directly applicable to defined benefit plans, they note it effectively demonstrates the principle that use of pre-retirement mortality is appropriate only to the extent that benefits will be forfeited upon death.

In response to Plaintiffs' arguments that pre-retirement mortality factors should not be employed in calculating the value of lump sum benefits, the RIGP points to Code § 417(e) as authorizing use of a pre-retirement mortality discount in calculating the value of lump sum payments. While it is the case that Code § 417(e) specifies a mortality table to be used in computing a lump sum, this is so because some assumption about life expectancies is necessary in order to estimate the value of the age sixty-five annuity. The Court believes that the "applicable mortality table" language found in Code § 417(e) allows use of mortality assumptions for periods after age sixty-five because the employee will die some day and the annuity payments will cease; but, this does not translate into the statute also allowing use of a mortality discount for periods before age sixty-five, a period of time during which the death of the participant will not reduce the amount of the benefit payable under the RIGP.

Stated another way, when a participant in a pension plan attains age sixty-five and starts receiving monthly annuity payments, those annuity payments will stop (or, in the case of a joint and survivor annuity, decrease) when he dies. Thus, a mortality assumption for periods after age sixty-five must be employed to reflect the economic reality of the pension promise. This is different, however, than using pre-retirement mortality in conjunction with the applicable interest rate to determine a present value, which is what the RIGP proposes. The Court concludes that where the event of the participant's death before age sixty-five will not result in a reduction in benefits, the use of a mortality discount to determine the present value of the participant's benefit will result in a forfeiture prohibited by ERISA.

The Court also rejects the RIGP's contention that it is appropriate to use pre-

---

**15.** 29 U.S.C. § 1053(a).

**16.** 26 U.S.C. § 411(a).

retirement mortality factors in calculating benefits because, in cases of pre-retirement death by RIGP participants, benefits payable to their beneficiaries are "ancillary benefits." This argument ignores key language in Treasury Reg. § 1.411(a)–7(a)(1)(ii), which makes it clear that the "death benefit" the RIGP pays with respect to the cash balance accounts is not an "ancillary benefit" within the meaning of the Regulation. An "incidental death benefit" is only an "ancillary benefit" under § 1.411(a)–7 if it is "not directly related to retirement benefits." The death benefit paid under the RIGP, i.e., the entire amount of the account, is directly related to the retirement benefits. In fact, the death benefit is the retirement benefit the participant otherwise would have received.

In sum, the Court rejects the RIGP's contention that the benefit recalculations submitted by Plaintiffs are incorrect because they fail to employ pre-retirement mortality discounts in determining the amount of the lump sums.

### 3. *The Appropriate Projection*

■ In its July 27, 2001 Order, the Court determined the interest rate Plaintiffs were to use in projecting the Class members' cash balance accounts to age sixty-five was the Interest Crediting Rate in effect as of the original date of distribution. In light of the RIGP's argument that this rate is improper, the Court has reviewed its prior Order and the materials submitted by the parties and believes that use of these projection rates is appropriate.

As the *Esden* Court noted, Treasury Regulation § 1.401(a)(4)–8(c)(3)(v) dictates that the current interest crediting rate is an appropriate rate to use for projection purposes. *See Esden,* 229 F.3d at 169.

That section deals with the "anti-discrimination" tests of ERISA and sets out a safe-harbor for complying with these tests. The section underscores that the correct approach in determining the accrued benefit is to project the account, at the date of distribution, at the current interest crediting rate or some rate that does not understate the projected value thereof.[17] *See also* "Nondiscrimination Requirements for Qualified Plans," 56 Fed.Reg. 47524, 47528 (1991) ("**[The § 417(e) ] rates, when combined into a single blended rate, are sometimes lower than the rates used by existing cash balance plans in determining employees' cash balances, and can therefore require a plan that does not use the section 417(e) rates [to credit accounts] to determine interest adjustments to pay an employee more than the amount of the employee's hypothetical cash balance when benefits are paid in a single sum.");** "**The Pension Distribution Answer Book," Panel Publications (2000 Edition), p. 9–57.**

Similarly, the Eleventh Circuit in *Lyons* held that the cash balance accounts at issue in that case also had to be projected to age sixty-five at the interest crediting rate set forth in the Plan. Indeed, the *Lyons* Court could not have reached its determination that a violation had occurred unless it concluded that projections at the interest crediting rate in effect as of the date of distribution were required. *See, e.g., Lyons v. Ga.-Pacific Corp. Salaried Employees Ret. Plan,* 196 F.Supp.2d 1260, 1266 (N.D.Ga.2002). On remand, the district court required that the cash balance accounts be projected to age sixty-five at the plan's interest crediting rate in effect as of the date of the original lump sum distributions. *Id.* at 1265–67.

---

**17.** As Plaintiffs demonstrated at the liability stage, using the PBGC rates the Defendants

claim are appropriate may cause the Plan to fail the anti-discrimination rules.

A recent report issued by the Inspector General for the Department of Labor emphasizes the propriety of the Court's "projection interest rate" ruling. In the Report, the Inspector General reiterates the requirement that lump sum distributions be determined by projecting a cash balance account to age sixty-five with the interest credits. Of course, the IRS has also determined that such a projection is required in Notice 96–8. In short, this Court's prior Order requiring projection to age sixty-five at the interest crediting rate in effect as of the date of distribution is in accord with the courts, commentators, the IRS, and the Department of Labor's Inspector General. Given these facts, the Court is convinced that its selection of the Interest Crediting Rates in effect as of the dates of the original lump sum distributions for projection purposes is appropriate.

The RIGP proposes that the Court use the actual Interest Crediting Rates over the intervening years to "project" the accounts of Class members who reached age sixty-five during the date they received their original distribution and today. Because those rates have sharply declined since the early 1990s, this would result in most Class members, and particularly those who received their lump sum distributions in the earlier years, receiving nothing as a result of the Plan's failure to comply with ERISA. The principal problem with Defendant's argument is alluded to by its own reference to "20–20 hindsight." Hindsight is not relevant to the legal obligations the Plan was under when it originally paid the lump sum distributions at issue in this litigation. Under ERISA § 205(g)(3) and Code § 417(e)(3), as implemented by Treasury Regulation § 1.417(e)–1(d), "the present value of any

optional form cannot be less than the present value of the normal retirement benefit...." This requirement must have been fulfilled the date the Plan made the original distribution. *Esden*, 229 F.3d at 164–65.[18] Thus, the Plan cannot pay part of what it supposes the accrued benefit/normal retirement benefit to be, and then make up the shortfall, if any, at some later date. *See also* Treasury Reg. § 1.401(a)–1(b)(1); *Esden*, 229 F.3d at 166 n. 16.

In addition, if the Court were to adopt such a rule, it would also be creating causes of action for participants who received their original distributions if interest rates then rose in the years between the distribution and the participant's sixty-fifth birthday. The Plan's approach to relieving itself of liability to the Class members in this case could ultimately impose upon it millions of dollars of additional liability when interest rates rise, as they undoubtedly will.

The Court believes a "time-of-valuation" rule is both equitable and appropriate. *See, e.g., Donovan v. Bierwirth*, 754 F.2d 1049, 1057 (2d Cir.1985). Such a rule comports with Treasury Regulation § 1.417(e)–1(d) and the purpose of the minimum distribution and definitely determinable benefit rules. It also provides the Class members with the lump sum distributions that were required by the law at the original date of distribution, puts the Class members into the position they would have been in had the Plan complied with ERISA at the time of the original distributions, and prevents the Plan from benefitting from its wrongdoing. In addition, such a rule does not allow current or future Plan participants or their beneficiaries to hail the RIGP into court because interest rates escalate between the time of

---

**18.** *See also Spacek v. The Maritime Assn.*, 134 F.3d 283, 290 (5th Cir.1998); *Blessitt v. Ret. Plan for Employees of Dixie Engine Co.*, 817 F.2d 1528, 1531 (11th Cir.1987); *Hickerson v. Velsicol Chem. Corp.*, 778 F.2d 365, 378 (7th Cir.1986).

their original lump sum distributions and the date they reach age sixty-five.

■■■ This Court enjoys broad discretion in affording relief under ERISA. "The enforcement provisions of ERISA are intended to provide broad, flexible remedies to redress or prevent statutory violations." *Cummings by Techmeier v. Briggs & Stratton Ret. Plan,* 797 F.2d 383, 390 (7th Cir.1986); *See also United States v. Bd. of Sch. Comm'rs of City of Indianapolis,* 677 F.2d 1185, 1188 (7th Cir.1982) (**"in equity cases ... the trial court has broad discretion in fashioning remedies"**). The Court sees no reason why the remedy in this case should be designed in the manner currently most favorable to the RIGP. *See Leigh v. Engle,* 727 F.2d 113, 138–39 (7th Cir.1984). The purpose of ERISA's minimum distribution rules is, in part, to provide lump sum recipients with enough money to enter the prevailing market and purchase an annuity or set aside the money at the then prevailing rates to accumulate towards an age sixty-five annuity. It makes little sense to allow the Plan to violate ERISA's dictates, and then reward it for its good fortune in the recent interest rate decline.

The Court also finds as persuasive case law from this Circuit and sister circuits holding that, in the context of ERISA claims for breach of fiduciary duty, courts are to calculate damages in the manner most favorable to injured beneficiaries. As one court has stated,

> Defendants, moreover, concede that their proposed measure of losses allows them to escape personal liability .... This result is clearly violative of § 409(a)'s requirement that a fiduciary in breach of trust be held personally liable to make good all losses to a plan .... The Second Circuit has made plain that any formula for determining losses must be responsive to the important societal interest in deterring reckless and

intentional fiduciary misconduct .... In this vital area of employee pension benefits, a penalty for breach of trust limited to the restoration of actual losses would have no deterrent effect. Instead, it would tempt the venal and unscrupulous to take the risk. The future welfare of millions of working men and women and their families is simply too precious to leave to such equivocal protection.

*Schoenholtz v. Doniger,* 657 F.Supp. 899, 903 n. 2 (S.D.N.Y.1987). *See also Roth v. Sawyer–Cleator Lumber Co.,* 61 F.3d 599, 602 (8th Cir.1995) (**ambiguities in determining loss to plan are to be resolved against ERISA trustee**); *Laurenzano v. Blue Cross & Blue Shield of Mass., Inc. Ret. Income Trust,* 191 F.Supp.2d 223, 242–43 (D.Mass.2002) (**rejecting pension plan's attempt to turn liability ruling into payment of no additional benefits through "the math."**)

The Court has also considered the alternative rates proposed by Plaintiffs. While the Court has not re-computed all of the additional benefits using Plaintiffs' proposed rates, it appears either of these rates would increase the additional benefits due to the Class as a whole. The Court does not believe these rates are more appropriate than the rate the Court has already selected and declines to adopt them now.

#### 4. *Appropriate Discount Rate*

Finally, Defendants contend that some of Plaintiffs' calculations are incorrect because the use of 100% or 120% of the applicable PBGC rate(s) is determined on the basis of the present value of the defined benefit (i.e., the projected CBRA) at age sixty-five, if any, after the offset of the projected TRAs. Defendants argue that the offset of the TRA from the CBRA should have occurred after discounting to present value. This argument directly

contradicts the Court's Order dated July 27, 2001. In that Order, the Court first recognized that it is the age 65 benefits attributable to the TRA and CBRA that must be offset. *See Berger*, 157 F.Supp.2d at 1010. The Court then found that determining whether use of 120% of the PBGC rate was appropriate turned on the amount of the defined benefit remaining, if any. *See id.* at 1010–11. This is the way floor offset plans are required to operate. *See Lunn v. Montgomery Ward & Co., Inc., Ret. Sec. Plan*, 166 F.3d 880 (7th Cir.1999).

The Court's prior rulings "are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure." *Rhone–Poulenc, Inc. v. Int'l Ins. Co.*, 877 F.Supp. 1170, 1173–74 (N.D.Ill.1995). Further, ill-founded requests for reconsideration of issues previously decided "needlessly take the court's attention from current matters and visit inequity upon opponents who, prevailing in an earlier proceeding, must nevertheless defend their position again and again." *Union Oil Co. of Cal. v. John Brown E & C*, No. 94C4424, 1998 WL 100325, at *1 (N.D.Ill. Feb.23, 1998).

### 5. *Remaining Arguments*

■ The Plan contends that the *Esden* court supports its contentions because it did not hold that the plan had to use the interest crediting rate in effect on the date of distribution as the projection rate. The Plan argues that the Second Circuit clearly knew that rate, and if it had believed the plan was required to use that rate, it would have explicitly done so. The Plan argues that the court remanded to the district court to determine what the projection rate should have been. In this Court's view, this evidence creates no genuine issue of material fact. It is well-settled that the recovery in a class action settlement may amount to less than the potential recovery by the class. *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 (2d Cir.

1974); *see also In re Sunrise Sec. Litig.*, 131 F.R.D. 450, 457 & n. 13 (E.D.Pa.1990). Merely because the settlement benefits, after remand, were paid at a rate that was sometimes lower than the *Esden* plan's interest crediting rate does not provide support for Defendant's argument.

■ As to Defendants' contention that the Court should refer this case to the RIGP administrator to determine the proper rates for calculating benefits for RIGP participants, the Court rejects this position. In actions for benefits due under an ERISA plan, a court, in its discretion, can remand a case to a plan administrator where the record before the court is not adequate to enable the court to ascertain whether the administrator's denial of benefits amounted to an abuse of discretion. *See, e.g., Leonhardt v. Holden Bus. Forms Co.*, 828 F.Supp. 657, 669 (D.Minn.1993). However, this case is not an action to recover benefits due under the express terms of a plan. Further, as noted, the Court is considering questions of law *de novo*, not reviewing the discretionary decisions of a plan administrator under a deferential standard. *See MacMillan v. Provident Mut. Life Ins. Co. of Phila.*, 32 F.Supp.2d 600, 616 (W.D.N.Y.1999) (citing *Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1099 n. 3 (7th Cir.1994)). In sum, the Court will not refer any part of this case to the RIGP administrator.

The Court has carefully considered the submissions of the parties and the arguments thereof. The Court holds that there is no genuine issue of material fact, and grants summary judgment in favor of Plaintiffs.

### E. *Prejudgment Interest*

■ A plaintiff is presumptively entitled to prejudgment interest where his claim arises under federal law. *See Rivera v. Benefit Trust Life Ins. Co.*, 921 F.2d

692, 696 (7th Cir.1991); *Lorenzen v. Employees Ret. Plan of Sperry & Hutchinson Co.*, 896 F.2d 228, 236–37 (7th Cir.1990). In this Circuit, prejudgment interest is typically assessed at the "prime rate," that is, the rate charged on short term, unsecured loans to creditworthy borrowers. *See Fritcher v. Health Care Serv. Corp.*, 301 F.3d 811, 819–20 (7th Cir.2002); *Gorenstein Enters., Inc. v. Quality Care–USA, Inc.*, 874 F.2d 431, 436–37 (7th Cir.1989). *See also Cement Div., Nat'l Gypsum Co. v. City of Milwaukee*, 144 F.3d 1111, 1112–13 (7th Cir.1998). The Plan has presented no evidence suggesting that the prime rate is inappropriate in this case; instead, it argues that the Court should ignore Seventh Circuit precedent and apply Eighth Circuit jurisprudence.

In accordance with Seventh Circuit authority, the Court will award prejudgment interest on the principal amount of the under-payments to the Class at the prime rate for the period beginning on the date of the withholding of the Class members' respective benefits to the date of the entry of a final judgment and order.

### F. *Plaintiffs' Proposed Order*

 Finally, Defendant objects to the Court requesting Plaintiff to prepare and submit a proposed order granting summary judgment in favor of Plaintiffs and against the Plan. Defendant asserts that it is "inadvisable and unfair" to allow the prevailing party to prepare a proposed order, citing *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) and *Holbrook v. Institutional Ins. Co. of America*, 369 F.2d 236 (7th Cir.1966). However, Defendant misstates the law in these cases regarding this issue. The Supreme Court has noted that it has "criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by citation to the

record." *Anderson*, 470 U.S. at 572, 105 S.Ct. 1504.

However, even in *Anderson*, the Court noted that "even when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous." *Id.* Additionally, the Court concluded that "the District Court in this case does not appear to have uncritically accepted findings prepared without judicial guidance by the prevailing party. The court itself provided the framework for the proposed findings … [and] respondent was provided and availed itself of the opportunity to respond at length to the proposed findings." *Id.*

The Seventh Circuit, too, has addressed this issue. In *Holbrook*, the court found that the trial judge announced his decision for the plaintiffs and then directed them to prepare findings which he adopted without change. 369 F.2d at 242. However, in that case, the district judge adopted the prevailing party's findings without any change. That is not the case here. The Court has carefully examined the law cited by Plaintiffs and Defendant and reviewed the arguments advanced in this case. Further, the Court has altered the proposed order submitted by Plaintiffs to ensure the order reflects the judgment of the Court.

> The Seventh Circuit has noted that
> [t]his is an old argument which is often resorted to by unsuccessful litigants. Each party, if he so desires, may present findings setting forth his theories and the evidence which he thinks supports those theories. It then becomes the duty of the court to select the findings which it thinks are correct. If all or any part thereof are wrong, they of course should be rejected. They may be restated in other language if the court so desires, or they may be adopted as

requested if the court so desires. If the court adopts them they become the court's findings regardless of who wrote them, and after that the only issue is their correctness, and we do not concern ourselves with their original authorship.

*Id.*

The Court has reviewed the legal authority cited and the arguments advanced by both parties. The Court has modified Plaintiffs' proposed order to ensure the order complies with the Court's decision and rationale. For this reason, the Court's order complies with the requirements of *Taylor Instrument Cos. v. Fee & Stemwedel,* 129 F.2d 156, 160–61 (7th Cir. 1942).

## IV. *CONCLUSION*

For all of the foregoing reasons, the Court **GRANTS** Plaintiffs' motion for summary judgment (Doc. 136). The Court **ORDERS** the RIGP to provide the Class members with equitable restitution in the form of the wrongfully withheld pension benefits plus prejudgment interest, calculated pursuant to the spreadsheet submitted by the Class and the methodology approved by this Order. The Court **DIRECTS** the Clerk of Court to enter judgment in favor of Plaintiffs and against the RIGP. The Court further **GRANTS** Defendant Conkright's motion for summary judgment (Doc. 146) and **DIRECTS** the Clerk to enter judgment in her favor.

The Court **further ORDERS** the RIGP to produce the information sought by Class Counsel with respect to the unknown Class members, if any, and **DIRECTS** Class Counsel to submit a supplemental report with respect to such Class members within ninety (90) days of the date of the entry of a final judgment and order.

The Court **further DENIES** Plaintiffs' motion for leave to file a reply to Defen-

dant's response to the proposed memorandum and order (Doc. 177).

**IT IS SO ORDERED.**